PIERRE CHOUTEAU, SEN., PLAINTIFF IN ERROR, *v.* WILLIAM ECKHART.

This court has jurisdiction, under the twenty-fifth section of the Judiciary act, in a Missouri land cause, where the title is not to be determined by Spanish laws alone, but where the construction of an act of Congress is involved to sustain the title.

The obligation of perfecting titles under Spanish concessions, which was as-

sumed by the United States in the Louisiana treaty, was ·a political obligation, ·to be carried out by the legislative department of the government. Congress, in confirming or rejecting claims, acted as the successor of the intendant-general; and both exercised, in this respect, a portion of sovereign power.

The act of Congress, passed on the 13th of June, 1812, confirming the titles and claims of certain towns and villages to village lots and commons, gave a title which is paramount to a title held under an old Spanish concession, confirmed by Congress in 1836.

THIS case was brought up from the Supreme Court of the state of Missouri, by a writ of error issued under the 25th section of the Judiciary act of 1789.

The facts were these:

On the 11th of January, 1797, Charles Tayon presented the following petition:

To Don Zenon Trudeau, lieutenant-governor of the western part of Illinois, at St. Louis:

Charles Tayon, sub-lieutenant of infantry, pensioned by the king, captain of militia, commandant, under your orders, of the village of St. Charles, of Missouri, has the honour to pray you to grant him a tract of timbered land of six arpens in width, fronting on the (marcies croche de la prairie bassé) Crooked swamp, in the low prairie, and extending to the Missouri, adjoining, on one side, to Mr. Ant. Janis, and on the other side, to lands not heretofore granted; favour which he expects of your justice. (Signed)   CHARLES TAYON.

St. Louis, 11th January, 1797.

On the 23d of January, Trudeau returned the following answer:   ·

*St. Louis, January* 23, 1797.

Having been informed that the land asked for, in order to procure timber, is in no way fit to be improved, on account of the inundations to which it is subject every year, and that the timber thereon is only good to burn, and will renew itself in a short time, and therefore cannot be ruined, as the timber growing on the hills, which experience has shown will never grow up again; and the said land being in the vicinity of the village of St. Charles and of various farms, in the prairie of its dependency, which would have to go a great deal further to procure wood; said tract shall remain (as well as all others adjoining, either in ascending or descending the Missouri, and which have been asked for by sundry petitions, addressed to us, together with the present, by Mr. Tayon) to the royal domain,

and for the common use of the said village of St. Charles, and for the lands already granted in the prairies, or to be granted hereafter: all which Mr. Tayon shall make known to all the inhabitants, and especially to those who have asked for land, and whose petitions I herewith return. (Signed) ZENON TRUDEAU.

On the 17th of November, 1800, Pierre Chouteau applied for an augmentation of a previous concession, as follows:

To Don Carlos Dehault Delassus, lieutenant-colonel attached to the stationary regiment of Louisiana, and lieutenant-governor of the upper part of the same province:

Peter Chouteau, lieutenant of militia and commandant of the fort of Carondelet, in the Osage nation, has the honour to represent to you, that formerly he obtained of Don Manuel Perez, lieutenant-governor of this part of Illinois, a concession for a tract of land of 10 arpens in front by as many in depth, to be taken on the left side of the Missouri, at about 20 arpens above St. Charles, upon which concession your petitioner has made all preparatory works for the construction of a water grist-mill, which was to be built on the creek comprised in his concession. The lieutenant-governor, Don Zenon Trudeau, was pleased to grant to your petitioner an augmentation to the said tract of 30 arpens in depth, all which is proven by the authentic documents necessary to this object. The desire of profiting of the favour which the general government granted to all those who presented their titles to obtain their ratification, caused your petitioner to address those same above-mentioned documents to a friend at New Orleans, to whom probably they have not been remitted, since he could not effectuate their presentation; the said original documents having not been registered in the archives of this government, your petitioner would be in great perplexity had he not to offer to you the attestation of Don Carlos Tayon, captain commanding the village of St. Charles, of Missouri, who at that time had a perfect knowledge of the original documents here above-mentioned, by virtue of which your petitioner was authorized to begin an establishment for which he has made considerable sacrifice.

Full of confidence in the justice and generosity of the government, he hopes that after the attestation you may be pleased to take from the commandant of St. Charles, you will have the goodness to ratify to him, and in the place, the security of a property which he has been enjoying for more than ten years by virtue of the titles to him

expedited by your predecessors, and of which he should wish that you would be pleased to order the surveyor of the Upper Louisiana to put him in possession in the following manner: to take two arpens below the creek comprised in his concession, and above said creek all the space which is between the said creek and the next plantation, by the depth of forty arpens, in order that, being possessed of the certificate of survey which shall be delivered to him, he may, if needed, have recourse to the superior authorities to obtain the ratification of the said title. The petitioner presumes to hope every thing from your justice in the decision of the case which he has the honour to submit to your tribunal.    PIERRE CHOUTEAU.

St. Louis of Illinois, 17th of November, 1800.

On the 18th of November, 1800, Delassus referred the matter to Tayon, who replied as follows:

*St. Louis of Illinois, 17th of November, 1800.*

Cognisance being taken of the foregoing statement, the sub-lieutenant in the royal army and captain of militia, commandant of the post of St. Charles, shall give, in continuation, information of all he knows upon what is here asked.    DELASSUS.

In compliance with the foregoing order, I do inform the lieutenant-governor that the statement of Don Pierre Chouteau is in all conformable to truth, having had full knowledge of the titles mentioned by him in his petition, as well as of the considerable works he has done on said land, of which he has always been acknowledged as the proprietor.    CHARLES TAYON.

St. Louis, 25th November, 1800.

On the next day, the 26th of November, 1800, Delassus issued the following order:

*St. Louis of Illinois, 26th November, 1800.*

Having seen the foregoing information and the just rights stated by Don Pedro Chouteau, to whom an unexpected accident has deprived of his title of concession, and considering that he has been for a long time proprietor of the land in question, the surveyor of this Upper Louisiana, Don Antonio Soulard, shall put him in possession, in the manner solicited, of the tract of land he petitions for; and the survey being executed, he shall draw a plat of said survey, which he shall deliver to the interested party, to serve to the said party to obtain the title in form from the general intendency. to which tribunal alone

corresponds, by royal order, the distributing and granting all classes of lands of the royal domain.    CARLOS DEHAULT DELASSUS.

On the 18th of January, 1801, the inhabitants of the village of St. Charles had a meeting and adopted the following proceedings:

"In the year eighteen hundred and one, on the 18th of January, at the request of Mr. Louis Barrada, syndic for the fences of this parish, we, Charles Tayon, captain-commandant of the said St. Charles, have given notice at the door of this said church, that all the inhabitants of this place should have to assemble this day in our government (house), in order to determine whether the commons at the lower end should be increased or not. The said inhabitants being then assembled, and the question being under deliberation, they all unanimously agreed, that for the interest of the said parish, the enclosed of the lands shall begin (*acoté*) by the side of Mr. Antoine Lamarche, and it shall be continued in descending to the Crooked swamp, all the way through the woods, to nearly opposite the house of the late Louis Hunault; thence it shall run in a straight line to the Missouri.

"The said inhabitants having thus determined on this head, it was agreed that the syndic on duty this year shall cause to be measured the quantity of arpens of land which are included in the new augmentation of the commons, in order to (*separter*) distribute to each inhabitant what he is to do with it, according to the usages which have always been observed, without wronging any one whosoever in the said distribution.

"It has been further agreed in the said assembly, that if hereafter the commons of the upper end should need to be enlarged, in order to procure more pasturage for the cattle, all the said inhabitants (*s'y porterons*) shall help in doing the same, as this day they bind themselves to do for the lower end, always without prejudice to any one whosoever. And as the said inhabitants will not undertake any thing without the consent of the lieutenant-governor, they have judged proper that the present deliberation should be communicated to him, and that he be supplicated to preserve to the said inhabitants of St. Charles, of Missouri, their upper and lower commons, in their whole and entire state, and they will bind themselves to enclose the same as they have done heretofore, in order to preserve their grain and other property.

"Done and agreed upon in our government (house), day and year as above. And all the said inhabitants have signed or made their customary marks."

On the 26th of February, 1801, Delassus made the following reply:

*St. Louis of Illinois, February 26th*, 1801.

All concessions and augmentations of property must be granted by the intendant of these provinces, on a petition which is to be presented by those persons claiming lands; but if the commons of the inhabitants of St. Charles is not sufficient for their cultivation, we do permit them, provisionally, to enlarge the same according to their wishes, without insuring to them the right of property, which they are to apply for as above mentioned. And the provisional lines of the said augmentation shall be drawn by Captain Antoine Soulard, surveyor of Upper Louisiana, who is the only person authorized to survey under our orders. It being well understood that nothing shall be done to the prejudice of any person.

(Signed) Carlos Dehault Delassus.

On the 23d of February, 1804, Delassus issued another order as follows:

C.—In consequence of the representation of the inhabitants of your post, which appears to me very just and well founded, after my decree of 26th February, in the year 1801, by which the augmentation therein mentioned is granted to them, and for which they have asked a survey by their petition of 27th April of the same year—which petition you have kept to this day without making it known to me, for which I hold you responsible—I apprize you that the surveys made in the said place cannot belong to any individual, but to the commons of St. Charles. Therefore you shall notify those who have had surveys made in the said place of this disposition, and you shall take the necessary measures for the execution of the whole survey asked for by the said petition of 27th April, according to the aforesaid decree of 26th February, in the year 1801.

May God have you in his holy keeping.

Signed in the original, Carlos Dehault Delassus.
Mr. Charles Tayon.
St. Louis of Illinois, 23d February, 1804.

I certify that the above is a copy of the original, (official letter,) addressed to Mr. Charles Tayon by the ex-commander-in-chief of

2 G

Upper Louisiana, Don Carlos Dehault Delassus, and presented to me by the citizens of note of the village of St. Charles, while I was commandant of the said village.

(Signed)                              JAMES MACKAY.

On the 2d of March, 1804, the surveyor-general, Soulard, having made a survey and plat in conformity with the above order, issued the following certificate: ·

I, Anthony Soulard, surveyor-general of Upper Louisiana, do hereby certify, that a tract of land was surveyed, meted, and bounded for, and in presence of, the syndic and inhabitants of St. Charles, (Missouri,) with the assistance of many of the inhabitants of said village, such as is represented in the plan hereto annexed, according to their petition therefore, dated January 18th, 1801, and the decree of the lieutenant governor, by which I am ordered to put them in possession of a sufficient quantity of land to serve them as a common; which surveys being completed, I find the said tract of land to contain 14,000 arpens, (superficial measure,) the admeasurement being made with the perch of Paris, of 18 pies in length, also Paris measure according to the usages or customs of this country; which tract of land is situate on the left side of the Missouri river, at about twenty-one miles from the town of St. Louis, bounded as follows, viz.: N. E., lands of the royal domain; S. E., the river Missouri; S. W., partly by land of St. James d'Eglise; N. W., by sundries, namely, Francis Duquette, the inhabitants of Marias Croche, lands at the Mamelles, lands of various proprietors, and lastly, by lands of Frs. Duguette, Joseph Tayon, John Tayon, and royal domain. This survey and admeasurement made without noticing the variation magnetic needle, which is (now) 7° 30' E.; the whole as represented in the plan hereto prefixed, in which the courses, distances, metes, bounds, &c., are noted.

This survey made in conformity to the decree of the late lieutenant governor, Ch. D. Delassus, dated February 26th, 1801, which is hereto annexed, the whole laid down from the field-notes of my deputy, James Mackay, dated on the 27th (day following) of the month of February, of this present year, which I signed.

St. Louis, March 2d, 1804.                  ANTHONY SOULARD.

*Notes.*—All the metes and corners are designated in the plan. All the trees in the lines are blazed, with two notches below the blaze. The trees on the right and left of the lines are merely blazed.   A. is

a tract of land subdivided among several persons, and called the Cul de Sac lands. C. is a tract also granted to several persons, and called the Grand Prairie.

I, Anthony Soulard, surveyor-general of Upper Louisiana, do hereby certify, that the above plan and notes of a survey agree in every part with the originals, which are filed in my office.

ANTHONY Soulard, *Surv. Gen.*

St. Louis of Illinois, March 2d, 1804.

On the 2d of March, 1805, Congress passed an act " for ascertaining and adjusting the titles and claims to land within the territory of Orleans and the district of Louisiana ;" the general purport of which was to recognise all existing grants. It further provided for the appointment of three persons who should examine and decide on all claims submitted to them and report the result to the secretary of the treasury, who was directed to communicate it to Congress.

On the 3d of February, 1806, the inhabitants of the village of St. Charles laid such of the above papers as relate to their title before the commissioners appointed under the act of 1805, and claimed a common for the general benefit of the inhabitants.

On the 3d of March, 1807, Congress passed another act relating to these land-titles, explanatory and corrective of the preceding act.

Both claims, that of Chouteau and the inhabitants of the village, were presented to the commissioners, who rejected Chouteau's and took no notice of the claim of the inhabitants of the village.

On the 13th of June, 1812, Congress passed another act " making further provision for settling the claims to land in the territory of Missouri ;" in which, amongst other things, it is enacted, " That the rights, titles, and claims to town or village lots, out-lots, common field lots, and commons, in, adjoining, and belonging to the several towns or villages of Portage des Sioux, St. Charles, &c., &c., &c., which lots have been inhabited, cultivated, or possessed prior to the 20th day of December, 1803, shall be, and the same are hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto : provided, that nothing herein contained shall be construed to affect the rights of any persons claiming the same lands, or any part thereof, whose claims have been confirmed by the board of commissioners for adjusting and settling claims to land in the said territory."

In 1813 another act was passed upon the subject, which does not appear to have any material bearing upon the case.

Chouteau *v.* Eckhart.

On the 26th of May, 1824, Congress passed another act " enabling the claimants to lands within the limits of the state of Missouri and territory of Arkansas, to institute proceedings to try the validity of their claims." It allowed any persons claiming lands under old grants or surveys, under certain circumstances, to present a petition to the District Court of the state of Missouri, which court was authorized to give a decree in the matter, reviewable, if need be, by the Supreme Court of the United States. The 5th section provided that a claim not before the District Court in two years, or not prosecuted to final judgment in three years, should be for ever barred, both at law and in equity; and the 7th section directed that where a claim tried under the provisions of the act, should be finally decided against the claimant, or barred by virtue of any of the provisions of the act, the land specified in such claim, should, forthwith, be held and taken as part of the public lands of the United States, subject to the same disposition as any other public land in the same district.

This act was continued in force by the act of the 26th May, 1826, for two years; and by the act of 24th May, 1828, it was continued in force for the purpose of filing petitions, until the 26th day of May, 1829, and for the purpose of adjudicating upon the claims, until the 26th day of May, 1830.

Neither the claim of Chouteau nor the inhabitants of the village of St. Charles appears to have been presented to the District Court under any of these acts.

On the 27th of January, 1831, Congress passed another act, being a supplement to the act of 1812, in which it was declared, "That the United States do hereby relinquish to the inhabitants of the several towns or villages of Portage des Sioux, St. Charles, &c., &c., &c., all the right, title, and interest of the United States, in and to the town or village lots, out-lots, common field lots, and commons, in, adjoining, and belonging to the said towns or villages, confirmed to them respectively by the first section of the act of Congress, entitled, &c., passed on the 13th day of June, 1812."

On the 9th of July, 1832, Congress passed "an act for the final adjustment of private land-claims in Missouri," which authorized commissioners to examine all the unconfirmed claims to land in that state, &c. &c., to class them, and at the commencement of each session of Congress during said term of examination, lay before the commissioner of the general land-office a report of the claims so classed,

&c., to be laid before Congress for their final decision upon the claims contained in the first class.

On the 9th of November, 1832, Chouteau presented his claim to these commissioners, who, on the 2d of November, 1833, unanimously determined that the claim ought to be confirmed to the said Peter Chouteau, or to his legal representatives, according to the concession. Before this decision was made, Congress, by an act passed on the 2d of March, 1833, had directed the commissioners to embrace every claim to a donation of land, held in virtue of settlement and cultivation.

On the 4th of July, 1836, Congress passed another act confirming claims to land in the state of Missouri, by which it was declared that the decisions in favour of land-claimants, made by the above commissioners were confirmed, saving and reserving, however, to all adverse claimants, the right to assert the validity of their claims in a court or courts of justice; and the second section declared that if it should be found that any tract or tracts thus confirmed, or any part thereof, had been previously located by any other person or persons under any law of the United States, or had been surveyed or sold by the United States, the present act should confer no title to such lands in opposition to the rights acquired by such location or purchase, &c. &c.

In January and February, 1837, Chouteau had the land surveyed, which he claimed under the above confirmation, and it was admitted upon the trial that this survey included the land in possession of Eckhart, for which the present ejectment was brought

Chouteau having brought an ejectment, the cause came on to be tried in May, 1840. The defendant, Eckhard, endeavoured to show an outstanding title in the inhabitants of the village of St. Charles, under the grant for a common.

Upon the trial, the plaintiff, Chouteau, offered in evidence such of the facts above detailed as bear upon his title, and the defendant, in addition, gave the following evidence:

He then proved, by Judge Spencer, that he (witness) came to St. Louis in the winter of 1796; that he came to St. Charles in the winter of 1798; when he came to St. Charles, the town was surrounded by a fence. The witness, looking on the plat of the survey of the commons, said that the claim of Spencer under Rybolt was granted to conform to the fence of the commons, and to have the fence of the commons as its northern line; and, looking upon the plat of survey given in evidence by the plaintiff, says the whole of the land covered

by the plaintiff's claim, as laid down on that plat, was included in the commons fence, which was standing when he came here, and remained until after 1804.

Mr. Cunningham, another witness of the defendant, said that he was a deputy-surveyor of the United States, and, as such, he has surveyed the exterior lines of the commons of the town of St. Charles; that, in making such survey, he in some places found the lines of the Spanish survey, in others the timber was cut down, and, in prairie land, no lines of courses could be found; and that the Spanish survey conformed to the plat given in evidence in this cause.

This being all the evidence, the court, on motion of the defendant, instructed the jury, that, "if they believed, from the evidence, that the premises in controversy are included in the tract of land surveyed under the authority of the Spanish lieutenant-governor of Upper Louisiana, for the commons of the town of St. Charles, and held by the inhabitants of said town, and enclosed by them as their commons, under the Spanish government, the plaintiff cannot recover in this action;" to which instruction the plaintiff, by his counsel, excepts, and prays the court to sign this his bill of exceptions, which is done, and the same is made part of the record.

Both plaintiff and defendant gave in evidence sundry acts of Congress, and defendant gave in evidence a private act of the legislature of the state of Missouri, which they agree shall not be set out in the bill of exceptions, but may be read, and considered evidence in the Supreme Court, as if here inserted.

The jury, under this instruction found a verdict for the defendant. The case was carried to the Supreme Court of Missouri, where the judgment was affirmed, from which it was brought, by writ of error, to this court.

*Lawless* and *Bogg,* for the plaintiff in error.
*Gamble,* for the defendant in error.

The counsel for the plaintiff made the following points:

1st. That his title to the land in question is protected by the treaty of cession of 1803, article 3d, and confirmed by the Congress of the United States as such.

2d. That the title attempted to be shown in the town of St. Charles has not been sustained by any proof of grant by Spain or France, or by any grant or act of Congress since the treaty of cession.

3d. That the defendant having shown no title in himself, and no

outstanding legal estate, the decision of the Supreme Court of Missouri, overruling a claim, right, and title derived from the Spanish government, guarantied by the treaty of cession and confirmed by Congress, is erroneous and ought to be reversed.

In support of the first point, they cited the cases of Delassus and Chouteau and Mackay, reported in 9 Peters, and contrasted those cases with the present.

Assuming then, as demonstrated, that the plaintiff's title was *prima facie* good, his counsel will proceed to analyze that set up by the defendant, which the court will have already observed, is simply an attempt to show an outstanding legal estate, in the tract confirmed to Peter Couteau, in the town of St. Charles, or in the trustees of that town. The defendant has not shown any derivative title in him to the land in question, nor any colour for his possession thereof.

The question then, before the court is, whether the title of the town of St. Charles to their commons is paramount to that of the plaintiff, and includes the land which, as has been shown, was granted by the Spanish authorities to Peter Chouteau. If this question be resolved negatively, it must follow, that the decision of the Supreme Court of Missouri has been erroneously given against the title and right of Chouteau specially set up under the treaty of cession and the acts of Congress, and the repeated decisions of the Supreme Court in analogous cases.

The court will please to observe that no specific grant has been given in evidence by the defendant, of land as commons to the village of St. Charles.

The documents which have been given in evidence by the defendant will be seen, not only not to constitute a grant of commons, but specifically to refute the presumption of, and to negative such a grant.

In order to arrive at the conclusion that the town of St. Charles had title to a tract of land as commons, and that the land in question formed part of that tract, and that a legal estate in the whole of that common tract was outstanding against the plaintiff in ejectment, the counsel for the defendant were compelled to contend that the act of Congress of the 13th June, 1812, entitled "an act making further provision for settling the claims to land in the territory of Missouri," had the effect, *proprio vigore*, of confirming to the town (or village) of St. Charles, the title to the whole of the 14,000 acres included in the survey given in evidence by the defendant as common "adjoining and belonging to" that town, (village).

This interpretation of the act of 1812 has been adopted by the Supreme Court of Missouri, and, as a corollary or consequence of this construction, it has been decided by that court that a confirmation by the act of 1812 of commons, necessarily annuls or neutralizes, as against the inhabitants of the town or village, all grants or surveys made under the French or Spanish government, no matter of what date, which previous to the passage of the act of 1812 had not been " confirmed by the board of commissioners for adjusting and settling claims to land" in the then territory of Missouri.

The first section of the act of 1812 is relied on by defendant and by the Supreme Court of Missouri for the above operation. The counsel for the plaintiff in error submits that such a construction of the act of 1812, sect. 1st, is in opposition to the terms of the act itself, and would also be violatory of rights vested at the date of the treaty of cession, and protected by that treaty and by acts of Congress:

The first section of the act (the only part of that law which bears on the subject) enacts, " that the rights, titles, and claims to, in town or village lots, out-lots, common field lots and commons, or adjoining and belonging to the several towns or villages of Portage des Sioux, St. Charles, St. Louis and others in the Territory of Missouri, which lots have been inhabited, cultivated, and possessed prior to the 20th day of December, 1803, shall be, and the same are hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto, provided that nothing herein shall be construed to affect the rights of any persons claiming the same lands, or any part thereof, whose claims have been confirmed by the board of commissioners for adjusting and settling claims to land in said territory."

It is manifest from the terms of this section, that it was not the intention of Congress to confirm any lots or commons which did not on the 20th of December, 1803, belong to the several towns or villages mentioned respectively. The words " in, adjoining, and belonging to the several towns and villages" are surely significant and explicit terms—the words " which lots have been inhabited, cultivated, or possessed prior to the 20th December, 1803," are not more explicit and significant than the former words " in adjoining and belonging to"—yet the Supreme Court of Missouri have solemnly decided in the case of Jonas Newman *v.* L. E. Lawless, Missouri Reports, 279, that the first section of the act of 1812 could have no

confirmatory operation, in the case of a town lot in St. Louis, unless it were distinctly proved that on the 20th December, 1803, the lot existed as a St. Louis town lot. In that case the plaintiff Newman having failed to prove that essential fact, the judgment rendered against him in the Circuit Court was affirmed by the Supreme Court of Missouri. The Supreme Court of Missouri based their decision on the terms of the act which manifestly call for the existence of a town lot, and the possession of it as such on the 20th December, 1803, as essential to the confirmatory operation of the law.

It is submitted that precisely the same sound principle of construction ought to have been applied by the Supreme Court of Missouri to the case before the court, and it is contended that if it had been so applied, it would have led the Supreme Court to a decision in favour of the plaintiff. There could be no greater reason or justice for the confirmation of a title to a piece of ground as common, which did not belong as common to a village, than for the confirmation of a lot which did not exist or did not belong to anybody on the 20th December, 1803.

The Supreme Court of Missouri, in the present case, observe that there seem to be no questions arising in this case which were not involved in the case of Byrd v. Montgomery, 6 Missouri Rep. 510.

With great respect for the Supreme Court of Missouri, the counsel for the plaintiff in error contend that the facts in the case of Byrd v. Montgomery are totally different from those of the present case.

In the case of Byrd v. Montgomery, there was no grant of the specific tract of land to the person under whom the defendant claimed title. The defendant in that case set up, (as against the title of the town under the act of 1812,) a concession to one Francis Giguiere, dated 14th May, 1800, which was what is termed a floating concession, authorizing a location and survey on any part of the royal domain. No survey was made under this concession during the Spanish government, and the confirmation was reported by the recorder in 1815, on the ground of settlement right arising out of improvement.

The Supreme Court of Missouri were of opinion, that this confirmation in 1815, by the recorder, was subordinate to the confirmation of the commons of St. Charles by the act of 13th June, 1812, section 1st.

It is by no means the intention of the counsel for the plaintiff in

error, to assent to the correctness of the doctrines laid down in the case of Bird v. Montgomery. Quite the reverse; but the counsel for the plaintiff in error contend, that the title of the plaintiff in error in this case is totally different from that of Montgomery.

In the present case the grant to Chouteau, as has been observed, was special—it required no survey to locate it or ascertain its metes and bounds—these were specially described in the grant to Chouteau. Again, in Siguin's case, there was no possession—no improvement— no expenditure of money, skill, or labour in compliance with, and upon the condition imposed in the grant. In Giguiere's case there was no severance effected in favour of the grantee, of the land granted from the public domain. The treaty of cession, therefore, did not specially guaranty the land as it clearly did in the present case. The confirmation by the recorder in 1815 was based on cultivation in or prior to 20th December, 1803, and by virtue of the donation law of 1805, and the 3d section of the act of 1812. The report of the recorder of the 1st November, 1815, which embraced Siguin's settlement, was affirmed by the act of 29th April, 1816. It is mani- fest, therefore, that Giguiere's title emanated from a donation law of Congress, and not from an ancient and paramount Spanish grant, which, as in the principal case, severed the land from the royal do- main, and as such was protected by the treaty as private property.

It certainly has not been said or decided in the Supreme Court of Missouri, that a mere claim, without any shadow of right, could be enforced by Congress to the prejudice of an existing right and title— particularly such a right and title as that vested in the plaintiff in error.

The very reverse has been laid down by the Supreme Court of Missouri in the case of the widow and heirs of Mackay v. Dillon, 7 Missouri Rep. 7. The language of that court in that case is unambiguous on this point. They say, " that only such claims as were founded on right were designed to be confirmed. A mere claim, unaccompanied by any shadow of right, is clearly not such a claim as any act of Congress could confirm. The force of the term confirmation, of itself, implies some sort of a title in previous exis- tence."

It is true that the Supreme Court of Missouri, in the above case, came to the conclusion that the title of the inhabitants under the 1st section of the act of 1812, June 13th, to commons, was paramount to that of the plaintiff, who claimed under a grant and survey made

under the Spanish government to their ancestor, and a grant and survey recognised by the claimants of the commons, and laid down specially on the plot of survey, made in 1806 by Mackay himself, and submitted in support of the claim.

While the counsel for the plaintiff in error protest against the conclusion to which the Supreme Court of Missouri has arrived in the above case, as illogical, and utterly illegal and unconstitutional, they nevertheless feel justified in availing themselves of the admissions of that court, as above cited, to demonstrate that the doctrine insisted on by the defendant in this case, namely: that the act of 1812 confirmed to the people of St. Charles 14,000 acres of land, including the tract granted to the plaintiff, cannot be sound unless he previously establish that the tract claimed by the plaintiff constituted a part of the commons of St. Charles, on the 20th December, 1803. The words of the 1st section of the act of 13th June, 1812, would really seem to preclude all doubt on this point. According to those words, no rights, titles, or claims to commons are confirmed but those " to commons adjoining and belonging" to the several towns and villages named, and " according to their right in common thereto." To contend that this act could confirm or grant commons which were " not" adjoining and belonging to those towns or villages, and to which the inhabitants had no " right in common," would be to make a new law, and positively repeal that of 1812.

When we examine the action of Congress on the French and Spanish unconfirmed titles at the date of the passage of the act of 1812, it must be manifest that it could not have been the intention of Congress " to interfere with or transfer" (to use the language of Chief Justice Marshall in the above-cited case of Delassus under Deluzieres) to the town of St. Charles, the tract claimed by Pierre Chouteau. As has been shown, the claim of the plaintiff in error under his grant, had been placed before the first board of commissioners, under the act of 1805, was duly filed with the United States recorder, and had been, previously to the treaty of cession, actually registered among the archives of the Spanish government at St. Louis, as appears by the certificate of the surveyor-general Soulard, and by the book of Spanish record in St. Louis, to which he refers. This court will please to direct its attention to the act of Congress, approved February 15, 1811. 2 Story's Laws, 1178.

It will be seen that Congress by the 6th and 10th sections of that act, specially provided that no land should be disposed of at public or

private sale, "the claim to which has been in due time and according to law presented to the recorder of land-titles and filed in his office, for the purpose of being investigated by the commissioners." The court will also see that in no case was the decision of the commissioners in Missouri final, when that decision was against the claimant. Congress uniformly, in all the acts passed from 1805, to 13th June, 1812, inclusive, reserved the power to pass finally on those claims.

It is not contended that the act of 1812 amounted to a final disposition by Congress of the claim, right, and title, of Pierre Chouteau, Sen., to the land now in question.

The acts of Congress, since passed for the relief of claimants under French and Spanish unconfirmed titles in Missouri and Arkansas, demonstrate that Congress considered Chouteau's title as still in being, and not destroyed or even weakened by any antecedent law.

If this be not so, it must follow that the act of Congress of May 26, 1824, the act of 1828 continuing the act of 1824, the acts of 1832 and 1833; and lastly the act of 4th July, 1836, specifically confirming the title of the plaintiff in error, must have been all of them absurd and without a subject-matter to act upon. If the right, title, and claim of Chouteau to the tract now in question, had been extinguished by the confirmation to the town of St. Charles, it would seem that it, thenceforward, must have ceased to exist. It would be, it is submitted, a solecism, a contradiction in terms, to contend that Chouteau's title, though a nullity as against the title of the town of St. Charles, could have any being or validity as against the United States.

It seems, therefore, manifest that the utmost operation that can be given to the act of 1812 in favour of the towns and villages mentioned is, that of a transfer by the United States to those towns and villages of the right, title, and claim of the United States to all such land adjoining these towns and villages as belonged to these towns or villages as commons, and had not been granted to private individuals, and were not protected by existing laws or treaties.

Having said this much on the general principles upon which the 1st section of the act of 1812 ought to be construed and administered, and having shown, that excluding from our consideration the title set up by the defendant under the town of St. Charles, the plaintiff has established his *prima facie* case, the counsel for the plaintiff in error will now proceed, as summarily as they can, to

examine the grounds of the claim of the town of St. Charles to the tract in question as forming part of its common, and hope to be able to satisfy the court that the very documents given in evidence by the defendant negative, most positively, the claim of the inhabitants to the land for which this action was brought against the defendant William Eckhart.

(The counsel then examined Tayon's petition and Trudeau's answer, which are set forth in the statement of the case, and contended that the land of the plaintiff was not included, because the Marais Croche was situated below the town of St. Charles, and the grant of the plaintiff above the town; and also that the character of the land did not accord with that claimed by the plaintiff.)

Again, in the response of the lieutenant-governor there is no grant at all of common to the village of St. Charles. There is only a declaration that the wooded and low ground asked for by Tayon shall remain royal domain, and that the inhabitants of St. Charles may use it to obtain fuel. It is manifest that at the date of this answer of the lieutenant-governor to Tayon no grant had ever previously been made or even asked for of common. Tayon in his petition treats the land he asks for as land of the domain, and the lieutenant-governor in his reply affirms this view of it, and at the utmost assents to the use of it, until further order, by the inhabitants. It is difficult to imagine why or how this document can be relied on or used to establish the existence, in favour of the village of St. Charles on the 20th December, 1803, of any common right to the Chouteau tract, or indeed of any definite commons at all, upon which the 1st section of the act of 13th June, 1812, can possibly operate.

(The counsel then examined the proceedings of the inhabitants of the village, as detailed in the statement and observed,)

It is manifest from the above proceedings of the inhabitants of St. Charles, that at its date they had but a small tract which they used as common, or for the purpose of fuel, and that that part must have been the same referred to by Don Zenon Trudeau, in his answer to Tayon, and therefore situated on the Marais Croche below St. Charles. It is also manifest that the inhabitants at the date of said proceedings had no grant of commons from the Spanish government of any land adjoining the village; and that the language of Zenon Trudeau, treating the woodland as royal domain, was assented to by the inhabitants of St. Charles, not only in 1797, but on the 18th of January, 1801, the date of the proceedings.

It is manifest also, that those simple people never intended by the extension of the common to interfere with any private vested interest or right. They pledge themselves to exert themselves, but "always without prejudice to the interests of any person." They evidently never intended to deprive Pierre Chouteau of his property. They must all of them have been perfectly acquainted with Chouteau's land. The works executed by Chouteau and his ancient possession must have been notorious, and it is not to be supposed that the inhabitants of the village who were employed by Chouteau on his land, could have been ignorant of his claim to it. This view of those proceedings is submitted in order the better to understand the effect and import of the other documents, and evidence offered in support of the claim of commons in this case.

(The counsel then examined the effect of the meeting of the inhabitants which took place in January, 1801, and the order consequent upon it; and argued that no grant could be inferred from that order. They then examined the survey of Mackay, and contended,

1. This survey is totally unauthorized by the decree in obedience to which it is recited to be made.

2. This survey, admitting its exterior lines to have been correctly run, and in conformity to the order of the lieutenant-governor, does not conflict at all with the grant of the plaintiff in error, but is consistent with its existence and validity.

Which points were argued at length.)

In conclusion, the following were stated as the points which t.. argument was considered as establishing,

1st. That the title of the plaintiff in error to the tract granted to him on the 25th of November, 1800, by the lieutenant-governor of Upper Louisiana, is protected and guarantied by the treaty of cession, article 3, and has been specifically confirmed by the act of the 4th July, 1836.

2d. That the United States survey, No. 2982, given in evidence by the plaintiff, identifies the land so granted.

3d. That by virtue of said grant and survey so guarantied by treaty and confirmed by act of Congress, the plaintiff in error is entitled to the possession of the whole of the land included in said grant and survey.

4th. That the act of June 13, 1812, did not operate as a grant of the land, included in the grant and survey of the plaintiff in error, to the town of St. Charles for commons, or for any other purpose.

5th. That neither the town of St. Charles nor the defendant has shown any title whatever, to the land included in the United States survey, No. 2982, given in evidence on behalf of the plaintiff in error.

6th. That the survey and certificate offered in evidence by the defendant, are erroneous, illegal, and on the face of them void.

7th. That admitting the survey, No. 2982, to be within the exterior lines of the survey given in evidence by the defendant, of the commons of St. Charles, it does not follow that the grant and survey of the plaintiff in error are absorbed and annulled.

8th. That the town of St. Charles is estopped from denying the plaintiff's title.

9th. That the title of the plaintiff in error to the land included in survey No. 2982, is clear, definite, and specific, and clothed with all possible documentary form, coupled with a possession of upwards of twenty years.

10th. That the title set up by the town of St. Charles is, in its inception, uncertain, illegal, and even fraudulent.

11th. That the instruction given to the jury who tried the ejectment, by the Circuit Court of Missouri, on motion of the defendant, to wit: "That if the jury believed from the evidence that the premises in controversy are included in the tract of land surveyed under the authority of the Spanish lieutenant-governor of Upper Louisiana for the commons of the town of St. Charles, and held by said town, and enclosed by them as their common, under the Spanish government, the plaintiff cannot recover in this action," were illegal and unjust instructions, inasmuch as they assume facts as proved which were not proved, and leave matters of pure law to be decided by the jury, and were calculated to lead the jury into a mistake and misapprehension of fact and of law.

*Gamble*, for the defendant in error.

It appears that both parties claim the land, under titles originating under the Spanish government in Louisiana. So far as there is a conflict between these Spanish titles, and so far as the court of Missouri have decided between the parties on the relative merits of these titles, it is believed that the Supreme Court of the United States have not the jurisdiction to review the judgments of the state courts.

The courts of Missouri, in deciding upon the rights of parties, as they existed under the Spanish government, are governed by the

Spanish law, and neither the treaty of cession, nor the laws of the United States, are drawn in question in such decisions. If either party, by invoking the treaty as the guaranty of his rights, could draw his case within the cognisance of the Supreme Court of the United States, then all questions which may arise about property in Missouri, Arkansas, or Louisiana, claimed by title originating under the former governments, may be brought before this court. This question may, however, be regarded as settled, by the decision of this court in the case of the City of New Orleans v. De Armas and Cucullu, 9 Peters, 224. So far, then, as the state courts have decided this case, upon the comparative merits of the two Spanish titles exhibited by the parties, that decision will be regarded as conclusive by this court, unless, in making that decision, the state courts have improperly disregarded the claim of the plaintiff, as it may have been asserted under an act of Congress.

The plaintiff, in this case, exhibits his claim to the land in question, as commencing under the Spanish authorities, and then produces the act of Congress of the 4th of July, 1836, (4 Story's Laws of the United States, 2515,) as the confirmation of his title.

The defendant exhibits the title of the inhabitants of the town of St. Charles, under whom he claims this same land, as also commencing under the Spanish government, and as confirmed by the act of Congress of the 13th June, 1812. 2 Story's Laws of the United States, 1257.

The court of St. Charles decides, between these two titles, in favour of that set up by the defendant.

If the question were between the titles, only as Spanish titles, the state courts would have the exclusive right to determine it, but here are two acts of Congress, under which the parties severally claim, as the completion of their respective incomplete Spanish titles, and the state courts have supported the title of the defendant, under the confirmation by the act of 13th June, 1812.

The instruction given by the Circuit Court leaves to the jury to decide, from the evidence, " whether the land in question is included in the tract surveyed, under the authority of the Spanish lieutenant-governor, for the common of the town of St. Charles, and held by the inhabitants of said town, and enclosed by them as their common, under the Spanish government;" and pronounces the law, that if the land is embraced in such claim of common, then the plaintiff cannot recover in this action. The jury have found that the land is included

Chouteau *v.* Eckhart.

in the tract thus surveyed, thus held 'and enclosed as a common, under the Spanish government.

The instruction of the court is founded upon a comparison of the Spanish title to the commons, confirmed by the act of 1812, with the Spanish title of the plaintiff, as confirmed by the act of 1836; and is a decision in favour of the commons' title.

As this case fairly presents the question between two confirmations, by different acts of Congress, it becomes proper to consider the effect of such confirmations upon the legal title. It is to be borne in mind, that the act of June, 1812, confirms the claims to commons, as the final act of the government, and contemplates no other evidence of title to be thereafter given by the government; it is not a confirmation in the future, or dependent upon any condition; its language is, "the claims to commons," &c., "shall be, and the same are hereby confirmed."

It is believed to be clear, upon principle and authority, that when an act of Congress of this character has passed, and nothing remains to be done by any officer of the government to convey the title, the title passes by the act itself, and no shadow of title remains in the government to be conveyed subsequently to another individual.

The Supreme Court of Missouri has uniformly maintained this doctrine, and although the decisions of that court are not of binding authority in this tribunal, when construing an act of Congress, yet they are entitled to much consideration in a case like the present, when we reflect that such acts of Congress operate on a class of land-titles with which that court is familiar, and in which the citizens of the state are largely interested; and that acts of this description are always passed at the instance, and upon the urgent solicitation of the citizens of the state in which the lands to be affected lie. Under such circumstances, the proper meaning and effect of such acts are at once presented to the legal mind of the state, and are kept before that mind, until the acts receive a construction founded upon an acquaintance with the whole subject on which the acts operate. This construction is to be found in the decisions of the courts. While, therefore, this court, in examining a statute designed to operate throughout the United States, or through many of the states, (as do all general laws in relation to the public lands,) will be but little influenced by the authority of a state decision; it will be persuasively influenced by such a decision giving the interpretation of

2 H 2

an act of Congress which is local, and is applicable to a subject peculiarly within the acquaintance of the state tribunal.

(The counsel here commented on the decisions of the Supreme Court of Missouri in the cases Vasseur *v.* Benton, 1 Mo. Rep. 296 ; Bird *v.* Montgomery, 6 Mo. Rep. 510 ; Mackay's heirs *v.* Dillon, 7 Mo. Rep. 7 ; and also Strother *v.* Lucas, 12 Peters, 454.)

It is submitted to the court, that in whatever light a confirmation by act of Congress is to be viewed, whether as a new grant, or as connecting itself with the original title or claim of the confirmee, it must have the effect of passing the title of the United States, so that no subsequent grant or confirmation can give a legal title to the subsequent grantee.

If this conclusion be correct, the next question for consideration is, whether the confirmation of the common of the town of St. Charles, by the act of 1812, passed the title to the land in controversy ? On this question, the counsel for the plaintiff have argued, that the title, or claim, of the town to this land was not such a title as Congress could have intended to confirm by the act of 1812.

As the attempt is made, in this case, to escape from the obvious meaning of the act, by a critical examination of its language, it is proper to consider its terms with some care. The confirming section enacts, "That the rights, titles, and claims to town or village lots, out-lots, common field lots, and commons, in, adjoining, and belonging to the several towns or villages of Portage de Sioux, St. Charles, St. Louis, &c., which lots have been inhabited, cultivated, or possessed prior to the 20th day of December, 1803, shall be, and the same are hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto."

(The counsel then referred, for the history of the act, to Am. St. Papers, Public Lands, pp. 377, 549, and to the communication of Mr. Penrose to Mr. Gallatin ; also that of Mr. Riddick to the chairman of the Committee on Public Lands ; and then entered into a comparison of the titles of the plaintiff and defendant respectively.)

I proceed now, to examine the plaintiff's claim, as it has been acted upon by the legislation of the United States.

In the remarks that have been made upon the confirmation of the plaintiff's title by the act of 4th July, 1836, it has been considered as if it were a general confirmation, without any restriction, and it has been attempted to be shown, and it is believed successfully, that

even regarded in that light, it cannot prevail in this action over the confirmation of the commons. But I will proceed to show, from the laws of the United States, that this claim of the plaintiff has at one period been extinguished, as having any colour of title to the land, and that the subsequent act of confirmation, which was a mere gratuity, was not intended by the government to interfere with the titles which it had previously granted or recognised.

From the time the United States took possession of Louisiana, there has always been manifested a strong desire to adjust the claims of individuals to any land in the territory, with great promptitude, and upon the fairest principles. Tribunals have, from time to time, been established, to investigate the claims, with power, in some instances, to decide on the merits of the claims upon the most enlarged principles of equity, and in other instances, with authority to report their opinions to Congress for its final action. The desire to have all the claims promptly settled, is shown in the provisions of the various laws imposing penalties on those who should fail to exhibit their claims for investigation within the times prescribed. The following is a brief statement of these enactments:—

The proviso to the 4th section of the act of 2d March, 1805, (2 Story's Laws United States, 967,) declares, "that any incomplete grant, warrant, or order of survey, deed of conveyance, or other written evidence, which shall not be recorded as above directed, shall never after be considered, or admitted as evidence in any court of the United States, against any grant derived from the United States."

The 5th section of the act of 3d March, 1807, (2 Story's Laws United States, 1060,) contains a similar provision.

The 7th section of the act of 13th June, 1812, extends the time for filing notices by actual settlers on the land claimed, under a similar penalty. 2 Story, 1260.

The 1st section of the act of 3d March, 1813, authorizes those who have filed notices to file the evidences of title, under the same penalty.

These earlier acts are referred to, not as having any direct operation on the plaintiff's claim, but to show the uniformity of the legislation in relation to these claims, and to show that the provisions of subsequent acts, which do affect the plaintiff's claim, are not new or extraordinary provisions.

The act of 26th May, 1824, (3 Story, 1959,) which created a special jurisdiction in the courts of the United States, was designed to bring

these claims to a final close.  The 5th section of that act provides, that a claim not brought before the District Court in two years, or not prosecuted to final judgment in three years, shall be for ever barred, both at law and in equity.  The 7th section provides, that where a claim is barred, by being decreed against, " or by any of the provisions of the act, the lands shall forthwith be held and taken as a part of the public lands of the United States, subject to the same disposition as any other public lands."

This act was continued in force by the act of the 26th May, 1826, for two years, and by the act of 24th May, 1828, it was continued in force, for the purpose of filing petitions, until the 26th day of May, 1829, and for the purpose of adjudicating upon the claims, until the 26th day of May, 1830.

The record in this case shows no presentation of this claim to the District Court; and for the purpose of the question now under consideration, it is to be assumed, that it was not presented, or if presented, was decided against; the effect being the same in either case. It is certain, that it has not been confirmed by the courts, as the only confirmation relied on by the plaintiff is that of 1836.

Now, the right of the government to require a diligent prosecution of these claims, and to impose penalties upon the claimants for their negligence, is not to be questioned.  This court, in speaking of these provisions of law, in Strother *v.* Lucas, 12 Peters, 448, says : " These are laws analogous to acts of limitation, for recording deeds or giving effect to the awards of commissioners for settling claims to lands under the laws of the states ; the time and manner of their operations, and the exceptions to them, depend on the sound discretion of the legislature, according to the nature of the titles, the situation of the country, and the emergency which calls for their enactment. Reasons of sound policy have led to the general adoption of laws of both descriptions, and their validity cannot be questioned.   Cases may occur where the provisions of a law may be such as to call for the interposition of the courts ; but these under consideration do not."

In this case, then, the fifth and seventh sections of the act of 1824 had full operation on this claim of the plaintiff, at least from the 26th May, 1830, until the passage of the act establishing the last board, on the 9th July, 1832, and during that period the claim was barred, both at law and in equity; and the land, as far as this claim was concerned, was public land.   During that period, while the claim of the plaintiff was thus, by his own neglect, extinguished, the land was

held by the town of St. Charles, as confirmed to its inhabitants by an act of Congress, with no shadow upon its title : and it is now submitted to the court, that no subsequent action of the government could operate to affect the title, thus complete and unclouded, in the town of St. Charles.

If it be said, as it has often been said, that the government can waive any such forfeiture, I am free to admit that the United States are competent to waive any advantage which they might claim under such enactments, but I deny, that the claimant, having neglected to comply with the terms oɪ a law, and being thus barred, " at law and in equity," can, as against an individual citizen, be restored to any right of action by any act of the United States.

At this point, I will call the attention of the court to another act of Congress, which seems designed to cut off all questions between titles of the description of those now before the court.

It has been before observed, that the last day allowed for presenting petitions to the District Court was the 26th May, 1829, and a year was allowed for prosecuting them to final decision. If there was a failure to pursue the action thus offered to the claimant, the 5th and 7th sections of the act of 1824 barred the claim. Now, between the expiration of the time thus given for presenting the claim, and the passage of the act of 9th July, 1832, establishing the last board of commissioners, the Congress of the United States, on the 27th January, 1831, passed an act, by which the United States relinquished to the inhabitants of St. Charles all the right, title, and interest of the United States in and to the lots and commons. 4 Story, 2220.

If it should be supposed, that after the act of 13th June, 1812, the technical fee still remained in the United States, here is an act of Congress equally efficacious with a patent, to transfer that fee, and this act is passed when the claim of the plaintiff was barred, both at law and in equity, by his own negligence.

There is still another feature in the plaintiff's confirmation which requires notice, although, for the purposes of this defence, I think enough has been already said.

It will be seen, by reference to the various acts of Congress in relation to these claims, that while the government was disposed to treat the claimants with the utmost liberality, it was regarded as a duty which the government owed to those who held adverse titles to the land, that they should be protected from any disturbance which might

Vol. II.—47

be attempted under these later confirmations. The eleventh.section of the act of 26th May, 1824, (3 Story, 1963,) provides, "that if, in any case, it should so happen, that the lands, tenements, or hereditaments decreed to any claimant, under the provisions of this act, shall have been sold by the United States, or otherwise disposed of, in each and every such case it shall and may be lawful for the party interested to enter the like quantity of land," &c.

The last clause of the second section of the act of 24th May, 1828, which continues the act of 26th May, 1824, in force, provides, "that the confirmations had by virtue of said act, and the patents issued thereon, shall operate only as relinquishment of the title on the part of the United States, and shall in nowise affect the right or title, either in law or in equity, of adverse claimants of the same land."

These provisions, intended to apply to confirmations which should be made by the decrees of the highest tribunal in the land, show the fixed determination of the government to protect the rights of those holding the land under any title adverse to the confirmations.

In the same spirit, and with the same purpose, a like provision was inserted in the 2d section of the act of 4th July, 1836, under which the plaintiff claims. That section enacts, "that if it shall be found that any tract or tracts, confirmed as aforesaid, or any part thereof, had been previously located by any other person or persons, under any law of the United States, or had been surveyed and sold by the United States, this act shall confer no title to such lands, in opposition to the right acquired by such location or purchase, but the individual or individuals, whose claims are hereby confirmed, shall be permitted to locate so much thereof as interferes with such location or purchase, on any unappropriated land," &c.

Although the most obvious application of the words, "previously located under any law of the United States," is, to the class of titles in Missouri which originated in the act for the relief of the inhabitants of New Madrid who suffered by the earthquake, and who were authorized to locate other lands in lieu of those injured; still it is plain, that all titles which had received the sanction of government were equally deserving of protection against disturbance from these confirmations. The language used in the 11th section of the act of 1824, "sold or otherwise disposed of," would have embraced every description of title conferred by the government, by which the land was disposed of, and would have protected the town of St. Charles against the plaintiff's claim, if it had been presented to the court

under that act, and had been confirmed. The spirit of the legislation is to secure these prior titles; and unless there is some absolute necessity to construe the 2d section of the act of 1836 with the greatest strictness, and to exclude from its protection all titles which can by such construction be excluded, it is believed that the title of the town of St. Charles may receive the benefit of this section, as a complete defence against the plaintiff.

If, then, the commons of the town can with any propriety be said to "have been previously located, under any law of the United States," the act of 1836 confers no title against the claim of the town. On this question it is not thought necessary to remark, as it is to be determined by an examination of the section referred to. The effect of the section is, to leave the claim of the plaintiff unconfirmed, so far as it interferes with the titles designed to be protected.

If I have conveyed my ideas intelligibly, I think I have maintained the following propositions:

1. That between two confirmations by different acts of Congress, where no other evidence of title is contemplated by the confirming acts, the elder confirmation passes the legal title.

2. That the confirmation of the commons of St. Charles, by the act of 13th June, 1812, is a confirmation of the claim as it was spread on the records of the government.

3. That the claim, as evidenced by the survey and by actual possession, was adverse to the claim of the plaintiff.

4. That if the confirmations were to have effect, with relation to the merits of the original Spanish titles, then the title of the town of St. Charles to the land in question, as part of the common, is an older and better title than that of the plaintiff.

5. That the claim of the plaintiff to the land in question was extinguished by his neglect to present and prosecute it, under the act of 26th May, 1824, as that act was continued in force by the acts of 1826 and 1828.

6. That if the fee did not pass by the confirmation, it did pass by the act of 27th January, 1831.

7. That the confirmation of the plaintiff's claim by the act of the 4th July, 1836, did not operate to confer any title, as against the title of the town.

These points present, as it is believed, several distinct and complete defences to this action

Mr. Justice CATRON delivered the opinion of the court.

For the statement of the facts the report is referred to.

It is insisted this court has no jurisdiction to look into the plaintiff's concession of 1800; or to pass on it, under the 25th section of the Judiciary act—and the case in 9 Peters, 244, of New Orleans v. De Armis, is referred to as settling the question. If the plaintiff relied alone on a complete Spanish title, then the argument would be sound, but each party claims by force of an act of Congress; the plaintiff under that of 1836, and the defendant under the act of 1812, confirming to the inhabitants of St. Charles the village commons; and which is fortified by another act for the same purpose, of 1831. The decision of the Supreme Court of Missouri was opposed to the title set up under the act of 1836 by the plaintiff. From this decision he prosecuted a writ of error to this court.

Construction is called for on the acts on which both titles are founded; and as no occasion can arise in any instance involving construction, aside from a contest, making a case; the facts giving rise to it must be ascertained before the construction can be applied. To hold otherwise, would render the 25th section a dead letter in a majority of instances. The same question arose in the case of Pollard's heirs v. Kibbie, 14 Peters, 254, and again in that of The City of Mobile v. Eslava, 16 Peters, 234, both involving property at the city of Mobile; the first is not distinguishable from the present in its material features, so far as the question of jurisdiction is involved; and the latter covers the whole ground before us. In the cases cited, as in this, the record set out the titles on each side, together with the facts and charge of the court; from which it appeared the decision of the Supreme Court of Alabama was opposed to the plaintiff's title, the judgment below having been affirmed. This court did not then doubt its powers to look behind the act of Congress, into the Spanish concession of Pollard, for the purposes of construing the act, and comparing it with that under which the defendant claimed: not with the intention of setting up the concession as an antecedent title to the act, that would support an action, but for the purposes of the construction and application of the acts on which the controversy depends. And the same rules apply here.

The plaintiff's title is *prima facie* a good legal title, and will support an ejectment on the act of 1836, standing alone, if the land can be identified, as confirmed, without resort to the patent. This court held, in Strother v. Lucas, 12 Peters, 454: "That a grant may be

made by a law as well as a patent pursuant to a law, is undoubted, and a confirmation by a law is as fully, to all intents and purposes, a grant, as if it contained, in terms, a grant *de novo.*"    And as, according to the laws of Missouri, an action of ejectment could be prosecuted on Chouteau's title, by force of the confirmation, the construction of the acts of Congress, under which the respective parties claim, will decide the controversy.

The character and nature of the village right, in this country, is somewhat peculiar.    The inhabitants of Upper Louisiana resided in villages, almost exclusively, and cultivated common fields, enclosed by only one fence; each person who cultivated the soil having assigned to him, by the syndic of the town, a certain portion of land to cultivate.    In this manner the chief tillage of the soil was carried on; the other parts of the country being in the forest state.

The villages also required commons for pasturage for their horned cattle and horses, and for fuel and timber; this part not being enclosed.    The quantity included in the field, for pasturage, timber and wood, was regulated by the nature of the soil and timber, and accommodated to the wants of the inhabitants, and conceded at the discretion of the government; usually to very liberal extent.

As the principal support of the population was derived from agriculture and pasturage, the village commons were deemed of primary importance by the people and government, and as a common title more fav ured than individual titles in cases of conflict.

In this situation the United States found the country when they came into possession of it, in March, 1804, as the successor of France; or rather Spain, in virtue of the treaty of cession.    So great has been the change by the introduction of a population with different habits, and modes of agriculture, that it is difficult to estimate at this day the former importance of the village common to the French inhabitants:    It was the basis on which their society was formed to so material an extent, that the early acts of Congress could not be well understood, without a reference to this important circumstance; and especially not the sweeping act of 1812.

The lieutenant-governor of Upper Louisiana, (usually the military commandant,) made concessions for lands founded on such considerations as to him seemed just, and according to the policy of the province; ordered it to be surveyed by the public surveyor, who put the interested party into possession, pursuant to the lieutenant-governor's order, and delivered a plat of the survey to the party, in

I

order that he might obtain a title in form from the general intendency at New Orleans ; to which tribunal alone appertained, by royal order, the distributing and granting all classes of lands of the royal domain. The intendent-general had the power to adjudge on the equity of the claim, and to exercise the sovereign authority, by making the grant, as the king's deputy.

After the country changed owners, this government had imposed on it, as the successor of Spain, the duties previously performed by the general intendency, of perfecting titles to concessions made by the lieutenant-governors of St. Louis, Illinois.

Shortly after the United States came into possession, a tribunal was instituted consisting of a board of commissioners to investigate claims of this description according to the laws and usages of Spain, as they existed among the French population in Upper Louisiana, and to report to Congress, such as were by the tribunal deemed well-founded, just, and equitable, and that ought to have been confirmed by the general intendency, had no change of government taken place ; and such as ought not to have been confirmed : On these reports coming before Congress, it acted directly by statute, on such titles as were by the legislature considered well-founded and just claims. . In all such instances it acted as the successor of the general intendency, and had the same discretion to confirm ; and the sovereign power to perfect the incipient right ; or to reject it, that the intendent-general had : Each exercising sovereign power, in regard to the claim, with full authority to award, or to refuse, a perfect title.

As the board of commissioners had no capacity to grant, but only to ascertain facts, and report their opinions ; and their powers to examine, not extending to every description of claim, Congress acted in some instances independent of any recommendation : necessarily in cases where the board had no right to interfere.

Chouteau's claim had been presented to the board early in 1809 : In July, 1810, the board declared the opinion that this claim ought not to be confirmed ; and no action was had on it by Congress on the return of the report of 1810.

In 1812, Congress confirmed the village claims as follows :

"That the rights, titles, and claims to town or village lots, out-lots, common field lots, and commons, in, adjoining, and belonging to the several towns or villages of Portage de Sioux, St. Charles, St. Louis, &c., which lots have been inhabited, cultivated, or possessed prior to the 20th day of December, 1803, shall be, and the same are

hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several rights or right in common thereto."

A new board was organized according to an act of 1832, with powers to re-examine the claims (with others) deemed unworthy of confirmation by the former board. The new board was of a different opinion from the former in regard to Chouteau's claim, and in November, 1833, recommended it for confirmation, according to his concession: and it was confirmed by the act of the 4th of July, 1836; corresponding to a recent survey, made in conformity to the concession. The whole of the claim is included in the village common of St. Charles, as it existed on the 20th day of December, 1803; and under which the defendant protected his possession, as an outstanding title. The State Circuit Court in Missouri held the village right the better, and so charged the jury; which opinion was sustained in the Supreme Court of that state, on their former decisions: especially in the cases of Byrd v. Montgomery, 6 Mo. Rep. 514, and Mackay v. Dillon, 7 Mo. Rep. 10. The last involved a contest in which title was claimed by one party under the St. Louis common.

These cases maintain in substance, that such inchoate claims (as that of Chouteau was in 1812, when the community of St. Charles took its title, previously also inchoate) were not changed in their character, by the treaty by which Louisiana was acquired; that the treaty imposed on this government only a political obligation to perfect them: that this obligation, sacred as it may be, in any instance, cannot be enforced by any action of the judicial tribunals: and that the legislation of Congress from 1804, to the present time, has proceeded upon this construction of the treaty, as is manifested by the modes adopted to investigate the claims through boards of commissioners, and then acting on them by legislation. This court held likewise, in the United States v. Wiggins, 14 Peters, 350.

We think this reasoning correct, and necessarily following the nature of the claim as above set forth; it not having been perfected by the general intendency before the change of governments.

2. That court in substance also held, in the cases cited; that the federal government, being unable to confirm the same land to two adverse claimants, must then, to some extent, determine between the conflicting titles. Each claimant depends upon the justice or comity of the present government; and when the government exer-

cises its powers and confirms the land to one, it must necessarily be considered in a·court of law the paramount and better title.

We think this position also sound, and that it is conclusive against the validity of the plaintiff's title; and therefore order the judgment of the Supreme Court of Missouri to be affirmed.

#### ORDER.

This cause came on to be heard on the transcript of the record from the Supreme Court of the state of Missouri, and was argued by counsel. On consideration whereof, It is now here ordered and adjudged by this court, that the judgment of the said Supreme Court of the state of Missouri, in this cause be, and the same is hereby affirmed with costs.